Filed 7/19/13  P. v. Holeman CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E053332 |
| v. | (Super.Ct.No. FSB035285) |
| JONATHAN CRAIG HOLEMAN et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Brian S. McCarville, Judge.  Affirmed.

Diane Nichols, under appointment by the Court of Appeal, for Defendant and Appellant, Samuel Charles Wright, Jr.

David McNeil Morse, under appointment by the Court of Appeal, for Defendant and Appellant, Jonathan Craig Holeman.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, James D. Dutton, and Alana Cohen Butler, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I

# INTRODUCTION[1]

A jury convicted defendants Jonathan Craig Holeman and Samuel Charles Wright, Jr., of killing John Painter and his daughter, Barbara Martin, in Painter's vacation home in Lake Arrowhead. The six counts included two counts of first degree murder (§ 187, subd. (a)), two counts of robbery (§ 211), one count of burglary (§ 459), and one count of automobile theft. (Veh. Code, § 10851, subd. (a).) Counts 1 and 2 also included allegations of special circumstances for multiple murders and for felony murder based on robbery and murder—within the meaning of section 190.2, subdivision (a)(3) and (17)(A) and (G).

The two defendants were tried jointly with separate juries. The court sentenced both defendants to life in prison without possibility of parole.

In separate, but consolidated, appeals, defendants concede they killed the victims but they join in arguing they were guilty only of second degree murder because they did not intend to steal from the victims before they killed them. Wright particularly argues there is insufficient evidence for robbery or burglary to support Wright's convictions for those offenses and for murder with special circumstances.[2] Defendants also contend the trial court failed to instruct the jury on theft as a lesser included offense of robbery and committed a variety of instructional errors involving CALCRIM Nos. 362; 702 and 703;

---

[1] All statutory references are to the Penal Code unless stated otherwise.

[2] Although Holeman does not expressly adopt this argument, we still address it with regard to its possible effect on both defendants.

2

730, 1603, and 1702; and after-formed intent.  Additionally, Wright maintains there was no true finding regarding burglary and Holeman contends there was evidentiary error in admitting evidence of a jacket bearing a swastika patch.  Finally, defendants make claims of double jeopardy and cumulative error.

After a thorough review of the extensive record, we conclude no prejudicial error justifies reversal or any lesser relief as requested by defendants.  We affirm the judgments.

II

FACTUAL BACKGROUND

*A.  Father's Day, June 16, 2002, and Subsequent Events*

Painter, an 87-year-old man, owned a vacation home in Lake Arrowhead.  One of his daughters, Janet Fischer, helped care for him because he suffered from dementia.  Wright had performed handyman work for Painter over the years and more recently in April 2002.

In June 2002, Fischer went on vacation to Hawaii while her sister, Barbara Martin, age 58, stayed with Painter in Lake Arrowhead.  Fischer loaned Martin her Hyundai Accent so she would have reliable transportation.

Fischer spoke to her father and sister on the telephone while she was out of town but was unable to contact them after June 15, 2002.

In mid-June 2002, Wright told his friend, Ariane Ingham, that he needed about $1,000 to pay off some outstanding warrants and to hire an attorney.  About the same time, Wright complained to Rebecca Brown, a fellow methamphetamine user, that

3

Painter had underpaid him for work on some cupboards. On the morning of Sunday, June 16, 2002, (Father's Day) Ingham gave Wright and Holeman a ride to a gas station near Painter's house.

Later on the night of June 16, 2002, Wright agreed to pay Shannon Holmberg and Melanie Goldfield to clean the Painter house. The next morning, June 17, 2002, Wright, Holeman, Holmberg, and Goldfield met at the Painter house. Wright was driving the Hyundai. Wright and Holeman showed the women around and told them to avoid the basement due to some sewage problems. While cleaning, Goldfield noticed a fresh, dark red stain on the carpet in one of the bedrooms but she did not ask about it. It looked like someone had previously tried to clean it and Goldfield was unable to get the stain out. Goldfield also found Painter's identification card under the toaster in the kitchen. Wright told her to put it back.

Also on June 17, 2002, Holeman asked Holmberg to drive him to the Mountain Pawnshop in Crestline to cash a check for $300 from Painter's checking account with a note on the memo line that said "yard clean up." Because the pawn shop owner was unable to verify the funds or to reach Painter by phone, she refused to cash the check. Holeman left but returned and asked her to call Painter again. The man who answered sounded like Wright, whom the owner knew, so she still refused to cash the check.

Holeman tried to cash the same check at Johnny's Market in Crestline. The owner did not know Painter but he knew Holeman did not do maintenance work. The owner refused to cash the check. Holeman finally succeeded in cashing the check at Painter's bank, Jackson Federal Bank.

4

Painter's bank account showed debits for three checks: 1) a check for $1,600, with the memo "Decking," dated June 14, 2002, payable to "Sam C. Write," cashed on June 17, 2002; 2) the check for $300, payable to Holeman, with the memo "yard clean up," dated and cashed on June 17, 2002; 3) and a third check for $350, dated June 18, 2002, payable to "Jonathan C. Holeman," cashed on June 19, 2002. On June 20, 2002, a white male presented to the bank another check in the amount of $1,250 which was refused. A check from Painter's account may also have been used to pay for pizza.

In the week following Father's Day, Holeman and Wright and their friends took a trip to Victorville to score drugs and party at a motel. They all stayed at another house on Crest Forest Drive, partying and using drugs. Later on, Wright paid cash to stay at the Lake Arrowhead Resort but left without paying for what was consumed from the mini-bar in the room. Finally, on June 20, 2002, defendants used methamphetamine and partied at the Painter house with other methamphetamine users.

People who stayed at the Painter home noticed that the house had a foul odor. Wright, claiming he was the caretaker, explained that there had been a sewage leak.

B. *Wright's Arrest on June 21, 2002*

On June 21, 2002, a CHP officer pulled over Wright, driving Fischer's Hyundai sedan, for not stopping at a stop sign. Wright did not provide identification but he gave the officer Fischer's registration and expired insurance card and claimed he was using his boss's car. Because Wright had active warrants and a suspended license, the officer arrested and searched him. The officer found a credit card bearing Painter's name, which Wright said his boss had given him to purchase gas in lieu of payment for work. Wright

5

was held in custody for the mini bar theft at the Lake Arrowhead Resort, which he admitted.

As discussed below, Joshua Mitchell was a passenger in the Hyundai. Inside the car trunk, the officer found a leather jacket that bore a swastika patch.

## C. The Investigation

On June 26, 2002, a housekeeper for the property management company was cleaning Painter's house and noticed a foul odor and beer cans littered about, as well as items such as a man's belt, an empty man's wallet, and a note from "Sam." She alerted the rental agent because the scene seemed suspicious.

Painter's daughter, Fischer, had requested that law enforcement conduct a welfare check since she had been unable to contact her father or sister. When the welfare check was conducted on June 26, 2002, Painter and Martin's bodies were found in the moderate stages of decomposition. The victims had likely been dead for approximately two weeks. Martin's body was wrapped in a comforter and there was a plastic bag around her head. Painter's body was covered with a carpet. The back pocket of his pants was turned inside out.

Painter's death was caused by blunt force trauma to the head. He suffered bruises to the face and multiple skull fractures caused by at least six blows to the head with an instrument consistent with a ball peen hammer. One of the injuries to the back of the head likely occurred first and rendered him unconscious. The blood spatter evidence indicated that Painter had been hit in the head in the basement in roughly the same position where he was found.

Martin's death was likely caused by a combination of strangulation and suffocation. Extensive hemorrhages were located in the muscles and tissues of the neck. The hyoid bone above her voice box was broken. Those injuries were consistent with strangulation. The bag over her head may have caused suffocation but would not be apparent from any examination. She had a dislocated shoulder and hemorrhages to her chest consistent with a struggle.

Evidence collected at the scene connected Wright and Holeman to the Painter residence. Wright's fingerprints were found on a white plastic bucket and a beer can located outside the back door. Holeman's fingerprints were found on a vodka bottle located in the kitchen.

*D. Wright's Statements* (*Admitted Only Against Wright*)

Wright called his parents from jail. During one call, Wright told his mother that Holeman "need[s] to go clean up this one piece of property for me. Tell him to go clean up . . . he knows what it is." His mother asked about a check Wright had received from Painter and asked Wright for Painter's telephone number. He responded, "I can't fucking talk right now about that." He told her not to call the Painters because they were in Hawaii.

In another call recorded the next day, Wright's father asked how the Painters would find out where their car was. Wright explained that the police would notify them by mail and warned his father not to say anything about the car if they called. He admitted to his father that he had stayed at the Hilton with Painter's credit card and his father advised him to stop using it. When his father complained that they were almost

7

out of food, Wright told him to borrow money from Holeman.

In the final call to his mother, Wright said he wished he had bought food but he was not sure if he could have used Painter's credit card. His mother said she had spoken to Holeman who was "finishing up that job supposedly that you said."

Detective Heard interviewed Wright after he became a suspect in the homicides. Wright told him that he went with Holeman to Painter's house to fix cabinets. He submitted a bill to Painter and then went upstairs after Holeman told him to check a broken ceiling fan. Upstairs Wright found Martin convulsing on the floor next to the pool table. Holeman called Wright downstairs where Painter lay on the ground with severe head injuries.

Wright changed his story during his interview. He said that he told Holeman to put a bag over Martin's head to kill her. Later, he admitted to putting his hands around her neck and tying the bag over her head. He saw Holeman hit Painter twice in the head. He told Holeman to "finish what he had started" and put Painter out of his misery. Wright admitted that it sounded like he was controlling the situation. Wright used a white plastic bucket to throw water on Martin to make it look like she had drowned. He and Holeman rolled Martin's body into a sheet and took it down to the basement. When they returned some hours later, neither victim was moving so he knew they were dead.

At the conclusion of the interview, Wright wrote the following statement, "At one point I couldn't stand to see the victims in pain, I didn't know what to do, I said to John [Holeman] finish Mr. Painter to put him out of his misery, and on the female to discontinue to get a grocery bag from kitchen [*sic*] to cover her face— [¶] At one time

8

[there] was no right state of mind or control when this happen.  Sam L. Wright."

*E.  Holeman's Statements* (*Admissible Only Against Holeman*)

Brown had known Holeman for several years.  On June 27, 2002, Holeman came to her home, acting strangely.  He expressed paranoia about being bugged and started writing her notes which they passed back and forth.  Holeman wrote that, while hitting Painter in the head with a mallet hammer, he felt the life escape from Painter's body, which "gave him an overwhelming sense of power," so he continued to hit him.  Brown and Holeman burned the notes in the fireplace.  Brown was so horrified she left, even though Holeman told her he loved her and would not hurt her.  She did not return home for a week.

When Holeman spoke to Stacy Ray, a maternal figure to him, she noticed that he was wearing new clothes.  Holeman confided that he had done something really bad.  When he and Wright had been hired to clean up some pine needles, Wright hit Painter on the head with a hammer and instructed Holeman to help get Painter in the house.  Wright then killed a woman and threatened to kill Holeman if he did not help.  Holeman admitted that he wrapped the man in a carpet and that it was hard to kill the woman.  Although he changed the specifics of the story, he maintained Wright did all the killing.  Ray told Holeman to leave and instructed one of her friends to contact the police anonymously about what Holeman had said.

On July 1, 2002, Holeman called a person named "Jamie" from jail.  He told her he was going to be in prison for about 15 years because "me and Sam killed some people[,] dude."  When Jamie reacted with surprise, Holeman laughed.  When she said it

9

was not funny, he admitted that it was "kinda fucked up." He mused that he might get life in prison or the death penalty but he hoped he would be offered a deal.

Holeman boasted to Jamie he had been arrested by eight officers in suits and ties who pulled their guns out and chased him down the street. He explained that he had beaten Painter with a hammer and that Wright had killed the woman. He claimed he had flipped out and "spun outta' [his] mind." He referred to four additional murder charges and to shooting "some black dude or whatever." He called himself a murderer but denied raping Martin because he still had "some values and morals." He also claimed to have made $56,000 from the murders. He laughed and joked throughout the conversation.

*F. Defense Evidence*

Dr. Max Schneider testified for the defense regarding methamphetamine addiction. He explained how methamphetamine impairs perception and alters behavior. Used long term, methamphetamine can cause psychosis or trigger schizophrenia. Large quantities of methamphetamine may cause problems with impulse control and reasoning. Based on a hypothetical question, Dr. Schneider opined that a person "spun out" on methamphetamine may not be able to make rational decisions or weigh consequences and have difficulty distinguishing right from wrong.

III

SUFFICIENCY OF EVIDENCE FOR THE ROBBERY AND BURGLARY

CONVICTIONS AND SPECIAL CIRCUMSTANCE FINDINGS

Wright argues that his convictions for robbery and burglary, in addition to the robbery and burglary special circumstances, must be reversed because there was

10

insufficient evidence to support a finding that Wright had the intent to rob upon entering the Painter home or before he attacked Painter or Martin.  Respondent counters that the jury had substantial evidence upon which to base its verdicts because Wright needed money and was unhappy with Painter before the killings and, after the murders, he stole a substantial amount of property, including Painter's wallet, and never offered any other motivation for killing Painter and Martin.  We agree with the People.

The appellate court reviews a claim of insufficient evidence in the light most favorable to the judgment to determine whether the record contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  (*Jackson v. Virginia* (1979) 443 U.S. 307, 318-319; *People v. Tafoya* (2007) 42 Cal.4th 147, 170.)  The reviewing court does not reweigh the evidence or determine the credibility of the witnesses.  (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)  Rather, all reasonable inferences must be drawn in support of the judgment.  (*People v. Wader* (1993) 5 Cal.4th 610, 640.)  It is the jury that must be convinced of the defendant's guilt beyond a reasonable doubt.  (*People v. Ochoa,* at p. 1206.)  If the circumstances reasonably justify the jury's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the conviction.  (*People v. Kraft* (2000) 23 Cal.4th 978, 1053-1054; *People v. Stanley* (1995) 10 Ca1.4th 764, 793.)

Burglary is committed when a "person . . . enters any house, room, apartment . . . or other building . . . with intent to commit grand or petit larceny or any felony[.]" (§ 459; *People v. Montoya* (1994) 7 Cal.4th 1027, 1041.)  Robbery is defined as, "the

11

felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211; *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 166.)

If the evidence shows that the intent to steal only arose after the use of force, the taking will only constitute a theft. (*People v. Burney* (2009) 47 Cal.4th 203, 253; *People v. Lindberg* (2008) 45 Cal.4th 1, 28.) Intent is rarely demonstrated by direct proof but may be inferred by circumstantial evidence. One such circumstance, the theft of property from a dwelling, may create a reasonable inference of an intent to commit theft at the time of entry. (*In re Leanna W.* (2004) 120 Cal.App.4th 735, 741; *People v. Lewis* (2001) 25 Cal.4th 610, 643.) More specifically, "'when one kills another and takes substantial property from the victim, it is ordinarily reasonable to presume the killing was done for purposes of robbery.'" (*People v. Kelly* (1992) 1 Cal.4th 495, 529, citing *People v. Turner* (1990) 50 Cal.3d 668.)

Keeping these principles in view, substantial evidence supported the jury's findings that Wright entered the Painter residence with the intent to commit robbery and that Wright had the intent to steal before or during the murders. (*People v. Letner and Tobin, supra*, 50 Cal.4th at p. 166.) Furthermore, Wright could have formed the requisite intent any time after he entered Painter's house. (*People v. Sparks* (2002) 28 Cal.4th 71, 87-88.)

Shortly before the murders, Wright had complained to Brown about Painter underpaying him. Wright told Ingham that he needed money for outstanding warrants and a lawyer. Painter, of advanced age and with dementia, and Martin an older woman,

12

were vulnerable targets, less able to defend themselves. When Painter's body was discovered, his pants pocket was turned inside out, leading to a reasonable inference that his wallet was stolen. Wright was driving Fischer's car on the night of the killings and defendants began cashing Painter's checks soon afterwards. Wright had possession of Painter's credit card and defendants used Painter's money to buy methamphetamine and party in hotels in Lake Arrowhead and Victorville, and at the Cedar Grove and Painter houses. These substantial thefts continued well after the murders were committed, making it reasonable for the jury to infer that the thefts were intended upon entry of the Painter house and during the murders—and not merely an afterthought to two otherwise motiveless killings.

In an effort at rebuttal, Wright claims that the intent to steal was formed after the murders because Wright used Fisher's car hours after the killings and defendants did not try to cash checks until the following morning. Wright also asserts that the check cashing was done conspicuously and the thefts were not part of a plan to murder. In actuality, there was little delay in attempting to cash checks. The murders occurred on a Sunday and the check cashing commenced the next business day. Wright drove the car the same day as the killings and contemplated using Painter's credit card. The jury reasonably rejected defendants' theories.

Case law supports our conclusion. In *People v. Navarette* (2003) 30 Cal.4th 458, the court found sufficient evidence supported the burglary conviction and special circumstance under similar facts. In that case, the defendant argued there was insufficient evidence that he entered the victims' apartment with the intent to steal or that

13

he intended to take property by force or fear because the intent to steal may have been formed after the victims were dead.  (*Id.* at p. 499.)  The court rejected the defendant's claims, finding there was evidence that the defendant was seeking money just before the murders and he took one victim's property after murdering her.  The court reasoned that the jury was entitled to infer that the defendant killed the victims to take their property.  The court also acknowledged that a robbery cannot occur after a victim is dead; however, one could rob a living person by killing him and taking his property.  (*Ibid.*)

In *People v. Castaneda* (2011) 51 Cal.4th 1292, the court affirmed the robbery conviction and special circumstance based upon the findings that the defendant had taken property directly from the victim.  It also concluded that the jury could have reasonably found that the intent to steal was formed before death based upon the fact that the defendant had only been working sporadically, was using heroin regularly, and needed money to pay for drugs.  The court cited to various cases noting that addiction can demonstrate a motive for robbery.  (*Id.* at pp. 1324-1325.)  The court applied the same reasoning to the burglary conviction and special circumstance finding.  (*Id*. at p. 1326.)

As a final example, in *People v. Abilez* (2007) 41 Cal.4th 472, the defendant argued that the evidence was insufficient to show that he stole the victim's property by means of force or fear because the victim was already dead when he took the property. The court rejected the argument, noting that the actual theft of property and the defendant's request for money just hours before the murder was sufficient to uphold the jury's finding.  (*Id.* at pp. 506-507.)  The court likewise upheld the jury's verdict on the burglary conviction and special circumstance finding based upon the evidence that the

14

defendant sought out money right before the murder and then possessed stolen goods shortly after the crime which amounted to "strong circumstantial evidence that he harbored the intent to commit larceny when he entered the home." (*Id.* at p. 508.)

Similarly in this case, substantial evidence supported the robbery and burglary convictions and special circumstances. Wright needed money for warrants and to hire a lawyer. He felt that Painter had short-changed him on a job. He was also a methamphetamine addict. Painter's wallet was taken from his person. Wright used Painter's money to buy drugs and rent hotel rooms in Victorville and Lake Arrowhead while driving Fischer's car until he was arrested.

Given that Wright displayed the presence of mind to try to cover up the crimes and to benefit from the murders, the jury was entitled to reject the defense theory that the murders were committed in a drug-induced haze. Under the circumstances, a rational jury could have convicted Wright beyond a reasonable doubt on these charges and special circumstances.

IV

INSTRUCTION ON THEFT AS A LESSER INCLUDED

OFFENSE OF ROBBERY

Both defendants next contend that the trial court prejudicially erred by not instructing the jury sua sponte about theft as a lesser included offense of robbery. We conclude substantial evidence did not support the instruction and any error was harmless.

Theft is a necessarily included offense of robbery. Both offenses require a taking with the intent to steal; but robbery requires the additional element that the taking be

15

accomplished by force or fear. (§§ 211, 484; *People v Brew* (1991) 2 Cal.App.4th 99, 104.) When there is substantial evidence that a defendant decided to take property only after the killing a victim, a theft instruction on the lesser included charge must be given. (*People v. Turner, supra,* 50 Cal.3d at p. 690; *People v. Parson* (2008) 44 Cal.4th 332, 348-349.) Substantial evidence in this context means evidence "that a reasonable jury would find to be persuasive" that the lesser charge was committed, but not the greater. (*People v. Wilson* (2008) 43 Cal.4th 1, 16.) A lesser included offense instruction is not required when there is no evidence to support a finding that the lesser included offense was committed and not the greater. (*People v. Breverman* (1998) 19 Cal.4th 142, 154; *People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1367; *People v. Basuta* (2001) 94 Cal.App.4th 370, 392, citing *People v. Mendoza* (2000) 24 Cal.4th 130, 174.)

In cases where a lesser included instruction on theft was deemed necessary, substantial evidence demonstrated that the defendant killed the victim and then decided to commit the theft as an afterthought. In *People v. Webster* (1991) 54 Cal.3d 411, 443, the defendant testified that he decided to take the victim's keys and car only after a struggle. In *People v. Turner, supra*, 50 Cal.3d at page 690, defendant testified that he first killed the victim in self-defense before deciding to take his property. In *People v. Kelly, supra*, 1 Cal.4th at pages 528-530, defendant told the police that he found the victim's rings in a trash can only after raping and killing her.

In this case, substantial evidence did not support the lesser included charge of theft instead of robbery. Wright and Holeman's statements after the crimes notably do not demonstrate they decided to steal from Painter as an afterthought to the killings. Instead,

16

Wright's statement to Detective Heard focused on the manner of killing but not on the thefts or why the murders occurred. Wright's calls from jail focused on using Painter's checks and credit card and did not suggest that the idea of stealing only occurred to him after the killings. In Holeman's written notes to Brown, he did not refer to the thefts at all. He only described how he felt empowered while striking Painter in the head. Holeman's various statements about the murders to Ray accused Wright of forcing him to commit the crimes but said nothing about theft. While Holeman admitted having spent Painter's money afterwards, he did not claim that stealing only occurred to him after the murders. Holeman's jail call also contained no evidence of after-formed intent. When asked why he did it, he claimed he was "spun outta' [his] mind," admitted he took the money, and laughed about getting $56,000.

On this record, no evidence allowed the jury to conclude that the thefts were not considered until after the murders were accomplished. Although the People assert that there is no evidence that defendants committed robbery and burglary as an afterthought, defendants contend the absence of such evidence demonstrated they did not have any plan to steal and, instead, committed theft as a crime of opportunity. But, based on the circumstantial evidence, it is far more plausible that the robbery was financially motivated and planned before the murders were committed.

The scope of the theft committed after the murders was also relevant to defendants' intent. We repeat again the principle that "'when one kills another and takes substantial property from the victim, it is ordinarily reasonable to presume the killing was for purposes of robbery.'" (*People v. Kelly, supra,* 1 Cal.4th at p. 529, quoting *People v.*

17

*Turner, supra*, 50 Cal.3d at p. 668.) Defendants took Painter's wallet and credit card and Fischer's car keys. Defendants cashed checks from Painter's bank account. Defendants partied at the Painter house and other places using Painter's money. Furthermore, it is not unusual for drug addicts to steal or rob to support their habit. It is not reasonable to conclude that, after Wright and Holeman arrived to work for Painter, they spontaneously decided to kill the victims because they were "spun out," high on methamphetamine. The only reasonable conclusion based upon the evidence was that two methamphetamine addicts preyed upon two vulnerable victims to support their habit. No instruction on theft was warranted on these facts.

Even assuming the court should have instructed the jury on theft sua sponte it is not reasonably probable that defendants would have obtained a more favorable result if the instruction had been given. (*People v. Breverman, supra*, 19 Cal.4th at p. 178; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Defendants' behavior before the murders was consistent with a plan to commit a crime. When Ingham stopped at the gas station near Painter's house, Wright and Holeman left abruptly without asking her to pick them up later, probably to conceal where they were going and because they would not need a ride home. The Holeman jury's question about whether the intent to commit robbery or burglary develops after a killing is too slender a reed to support a claim of prejudicial error.[3] Based upon all the circumstances, defendants cannot demonstrate it is reasonably probable either would have received a more favorable verdict had the jury been instructed

---

[3] We discuss the jury's question more fully below when addressing Holeman's contention a pinpoint instruction was required about after-formed intent.

with the lesser included offense of theft for the robbery charges.

V

CALCRIM NOS. 730, 1603, AND 1702

Defendants contend that the trial court erred by instructing the jury based on CALCRIM Nos. 1603 and 1702, explaining that an aider and abettor's intent must be formed for robbery before or while the property is carried to a place of temporary safety and for burglary before the perpetrator left the structure. Defendants maintain the instructions could have confused the jury into believing that an accomplice could form the intent to aid and abet the underlying felony after the act causing death, which is impermissible for felony murder and the attendant special circumstances. Wright argues this error was compounded when the court omitted a portion of CALCRIM No. 730, specifically stating that one must intend to aid and abet the underlying felonies before or during the act causing death.

These arguments are forfeited because defendants did not object to CALCRIM Nos. 1603 and 1702 and Wright did not object to CALCRIM No. 730 as given. Generally, a failure to object to instructional error forfeits the issue on appeal if the instruction is correct in law and the defendant has failed to request clarification. (*People v. Catlin* (2001) 26 Cal.4th 81, 149.) CALCRIM Nos. 1603 and 1702 were correct statements of law with respect to the substantive crimes of robbery and burglary. (*People v. Cooper* (1991) 53 Cal.3d 1158, 1165-1167; *People v. Montoya, supra*, 7 Ca1.4th at pp. 1045-1047.)

Notwithstanding the issue of forfeiture, because the prosecution charged two

19

counts of robbery and one count of burglary, the subject instructions were applicable to the substantive offenses. Different instructions applied to the felony murder and special circumstances findings. The court did not err when it instructed the jury with CALCRIM Nos. 1603 and 1702 because those instructions did not address under what circumstances defendants could be found guilty of felony murder or culpable for the special circumstances.

Although the bench notes for CALCRIM Nos. 1603 and 1702 state that the instructions should not be given if the defendant is charged with felony murder, such use notes do not have "the force of law." (*People v. Alvarez* (1996) 14 Cal.4th 155, 223, fn. 28.) It would be more accurate to say that the instruction should not be given if a defendant is charged only with felony murder and not charged with robbery. If, on the other hand, a defendant is charged with both felony murder and robbery, the trial court must instruct on all of the elements of robbery. These include, in an appropriate case, when the intent to aid and abet the robbery must be formed. Because these defendants were charged with both felony murder and robbery and burglary, the trial court had to inform the jury of when the intent to aid and abet the burglary or robbery must be formed. As we have already discussed, there is no substantial evidence that "would permit the jury to find the defendant[s] began aiding and abetting an enumerated felony only after the killing[s] occurred, . . ." (*People v. Pulido* (1997) 15 Cal.4th 713, 728.) An examination of the entire charge reveals that the jury was properly instructed as to the timing of intent for aiding and abetting purposes as it related to the felony murder and special circumstances.

20

Furthermore, the jury instructions were correct and it is unreasonable that the jury would have misinterpreted them as defendants assert. Instructions are not viewed in isolation: "'"It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction."'" (*People v. Wilson* (1992) 3 Cal.4th 926, 943, quoting *People v. Burgener* (1986) 41 Cal.3d 505, 538.) The court told the jury that the instructions were to be considered together and that some of the instructions might not apply. (CALCRIM No. 200.) With respect to the special circumstances, the court specifically instructed the juries that the prosecution was required to prove that, "The defendant must have intended to commit, or aid and abet, . . . the felonies of robbery and burglary before or at the time that he caused the death." (CALCRIM No. 540B.) CALCRIM No. 549 required the prosecution to show that, "the robbery or burglary and the act causing the death were part of one continuous transaction." (CALCRIM No. 549.) The court also provided a special instruction regarding the timing of force stating, "Where a killer wounds the victim, then decides to steal, and thereafter finishes off the victim to accomplish the theft, the perpetrator has committed robbery and robbery murder."

In Holeman's trial, the court gave CALCRIM No. 730 which specified, "[I]f the defendant did not personally commit robbery or burglary then a perpetrator[,] whom the defendant was aiding and abetting before or during the killing[,] personally committed robbery or burglary." The instruction explains, "The defendant must have intended to commit[,] or aided and abetted the felonies of robbery or burglary before or at the time of

21

the act causing death."

When read together, there is no possibility that the juries would have misunderstood the court's instructions to mean that either defendant could have joined in the burglary or robbery after the acts causing death and still be liable for felony murder or the special circumstances. The instructions pertaining to felony murder and special circumstances, particularly CALCRIM No. 540B, clearly conveyed that an aider and abettor's intent must have been formed before or during the killings for the accused to be culpable for felony murder and special circumstances. The jury is presumed to have followed the court's instructions on those issues. (*People v. Boyette* (2002) 29 Cal.4th 381, 436.)

As to Wright, the modification of CALCRIM No. 730 was insignificant as that instruction, with the others, adequately conveyed when an accomplice's intent to aid and abet must be formed for felony murder and the special circumstances. Although the court omitted an "intent" portion of part of CALCRIM No. 730, the instruction nevertheless conveyed the point that the aiding and abetting must occur before or at the time of death. The intent to aid and abet is part and parcel of aiding and abetting. (CALCRIM No. 401.) Within the body of CALCRIM No. 730, it states the same idea in another way. "If the defendant did not personally commit robbery or burglary, then a perpetrator, whom the defendant was aiding and abetting before or during the killing, personally committed robbery or burglary." There is no reasonable possibility that the jury would have understood this instruction to allow someone to aid and abet a robbery or burglary before or during the time of the killing and also intend to aid and abet the robbery or burglary

22

later.  "[A] commonsense understanding of the instruction in light of all that has taken place at the trial is likely to prevail over technical hairsplitting." (*People v. Huggins* (2006) 38 Cal.4th 175, 193, quoting *Boyde v. California* (1990) 494 U.S. 370, 381.)  We conclude the jury was properly instructed when viewing the instructions as a whole.

Finally, even assuming the court erred in providing the jury with CALCRIM Nos. 1603 and 1702 and improperly modified CALCRIM No. 730, in light of the evidence, any error was harmless beyond a reasonable doubt.  (*People v. Esquivel* (1994) 28 Cal.App.4th 1386, 1399-1400; *Chapman v. California* (1967) 386 U.S. 18, 24.)  As we have reiterated, the facts of this case do not fit an interpretation that either Wright or Holeman intended to commit the robbery or burglary only after the murders were committed.  Defendants' admissions—introduced before their respective juries— indicated that they both actively participated in the killings of Painter and Martin and then proceeded to exploit the situation.  No jury reasonably would have found that either Wright or Holeman did not form the intent to commit the underlying felonies until after the murders because both were so deeply involved in the murders and benefited by the deaths in a calculated manner soon after the killings.

VI

CALCRIM Nos. 702 AND 703

Defendants next contend that the trial court erred by not instructing the jury sua sponte with CALCRIM Nos. 702 and 703 involving special circumstances for an accomplice where the multiple murder and felony murder special circumstances are alleged.  (§ 190.2, subd. (a)(3).)  Respondent concedes the trial court should have

23

instructed the jury with these instructions sua sponte but asserts any error was harmless beyond a reasonable doubt.

The trial court has a sua sponte duty to instruct the jury with CALCRIM No. 702 when special circumstances requiring an intent to kill have been charged and sufficient evidence supports the conclusion that the defendant was not the actual killer. (*People v. Jones* (2003) 30 Cal.4th 1084, 1118.) Likewise, the trial court has a sua sponte duty to instruct with CALCRIM No. 703 when sufficient evidence supports the conclusion that the defendant was not the actual killer and felony murder was alleged as a special circumstance. (See *ibid.*; *People v. Cleveland* (2004) 32 Cal.4th 704, 751-753.) CALCRIM No. 703 also requires that the aider and abettor's participation in the crime begin before or during the killing.

Here, the evidence largely suggested that Holeman killed Painter with Wright as an accomplice and Wright killed Martin with Holeman as an accomplice to that murder. In both trials, it was evident that Wright and Holeman went to Painter's house together and the victims were killed at roughly the same time. Wright admitted strangling and suffocating Martin with Holeman's assistance and participating in Holeman killing Painter. Holeman admitted that he bludgeoned Painter and it was difficult to kill Martin. Holeman's statements show he was an accomplice to either or both murders and he acted with an intent to kill. Defendants also apparently acted together to move Martin's body from the bedroom to the basement.

Because there was evidence in both trials that defendants may have been aiders and abettors in one or both of the murders, the trial court had a sua sponte duty to instruct

24

the jury with CALCRIM No. 702, as it pertained to accomplice liability on the multiple murder special circumstance, and CALCRIM No. 703, dealing with accomplice liability on the felony murder special circumstances.

Nevertheless, the failure to instruct with CALCRIM Nos. 702 and 703 is subject to harmless error analysis under *Chapman v. California, supra*, 386 U.S. at page 24. (See *People v. Jones, supra*, 30 Cal.4th at p. 1119, quoting *People v. Williams* (1997) 16 Cal.4th 635, 689.) On this record, the jury "could have had no reasonable doubt" that both appellants participated in the homicides with intent to kill (for the multiple murder or felony murder special circumstance) or were major participants in the robbery or burglary and acted with reckless disregard for human life (for the felony murder special circumstance)." (*Williams,* at pp. 689-691.) When the evidence to which a missing instruction speaks is overwhelming, and the jury could not have had a reasonable doubt about that evidence, the failure to give that instruction is harmless beyond a reasonable doubt. (*People v. Johnson* (1993) 6 Cal.4th 1, 45-46, disapproved on another ground in *People v. Rogers* (2006) 39 Cal.4th 826, 879-880.)

Had the jury been instructed that it needed to find intent to kill to satisfy the special circumstance requirements, no different result would have occurred. The facts of this case overwhelmingly demonstrate that both Wright and Holeman harbored such intent, whether as the perpetrator of a killing or an accomplice. The evidence of all the factors identified in CALCRIM Nos. 702 and 703 was substantial and, for the most part, uncontradicted. As to both defendants, the attacks on Martin and Painter were clearly coordinated as they occurred in the same place at around the same time. The manner of

25

the killings—by multiple blows to the head and strangulation—strongly supports a finding of intent to kill. (*People v. Proctor* (1992) 4 Cal.4th 499, 529-530; *People v. Cain* (1995) 10 Cal.4th 1, 40.)

The finding of felony murder special circumstance could have been made as well. As discussed, the evidence that both men were major participants in the underlying crimes and in light of the manner of the killings they certainly acted with reckless disregard to human life. In sum, the failure to instruct with CALCRIM Nos. 702 and 703 was harmless as the evidence of Wright and Holeman's intent to kill was overwhelming, whether as a perpetrator or an aider or abettor. Had the juries been given the instructions in question, they would have had no reasonable doubt that either Wright or Holeman in his role as an accomplice harbored an intent to kill for the multiple murder and felony murder special circumstance or were major participants in the underlying felonies and acted with a reckless disregard of human life for the felony murder special circumstance.

VII

CALCRIM No. 362

Defendants next contend the trial court prejudicially erred when it instructed the jury based on CALCRIM No. 362 regarding consciousness of guilt stemming from false statements. Defendants claim the instruction permitted the jury to presume guilt regarding defendants' mental state.

We disagree. The instruction as given could not be misinterpreted and the jury was not permitted to infer defendants' guilt from false statements alone. Moreover, in light of the other instructions and the persuasive evidence of guilt, any possibility of error

26

was harmless.

Neither Wright nor Holeman objected to instructing the jury with CALCRIM No. 362. The court read: "[I]f the defendant made a false or misleading statement before the trial relating to the charged crimes [or allegations], knowing the statements were false or intending to mislead, that conduct may show he was aware of his guilt of the crimes [and allegations] and you may consider it in determining his guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself."

Defendants acknowledge that the California Supreme Court has approved CALCRIM No. 362's predecessor instruction, CALJIC No. 2.03. "The inference of consciousness of guilt from willful falsehood or fabrication or suppression of evidence is one supported by common sense, which many jurors are likely to indulge even without an instruction." (*People v. Holloway* (2004) 33 Cal.4th 96, 142; *People v. Geier* (2007) 41 Cal.4th 555, 589.) The language contained in CALJIC No. 2.03 is not materially different than what was given here. That instruction stated, "If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crime or crimes for which he is now being tried, you may consider that statement as a circumstance tending to prove a consciousness of guilt. However, that conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide."

In *People v. McGowan* (2008) 160 Cal.App.4th 1099, the appellate court

27

explained that CALCRIM No. 362 "is the successor to CALJIC No. 2.03." (*McGowan,* at p. 1103.) It noted that there were only minor differences between CALCRIM No. 362 and CALJIC No. 2.03. The *McGowan* court determined that CALCRIM No. 362 is not an improper pinpoint instruction that highlighted particular evidence because, like CALJIC No. 2.03, it warns the jury that a defendant's false or misleading pretrial statement cannot alone establish guilt. (*McGowan,* at pp. 1103-1104.) The California Supreme Court has also used CALJIC 2.03 and CALCRIM No. 362 interchangeably, without finding any meaningful differences between the two instructions, when it held that the instruction did not invite the jury to make irrational or impermissible inferences with regards to a defendant's state of mind at the time the offense was committed. (*People v. Howard* (2008) 42 Cal.4th 1000, 1021, 1024-1025.)

Finally, the instruction provided that the jury could not rely on the false or misleading statement as proving guilt by itself. It is presumed that the jury followed the court's instruction. (*People v. Cain, supra*, 10 Cal.4th at p. 34.) Also in assessing whether CALCRIM No. 362 was given in error, the reviewing court must consider the entire charge of the court, not only one particular instruction. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.) When viewed as a whole, the jury could not have presumed guilt based on that instruction alone. The jury was instructed it could not use consciousness of guilt as proof of guilt by itself. Other instructions required the jury to find each element beyond a reasonable doubt, including mental state. In light of the other instructions regarding the requisite mental states and the prosecution's burden to prove all

the elements of the offenses, there is no reasonable likelihood that the juries applied the instruction in an unconstitutional manner. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72.)

Any error was harmless even under the most stringent standard of prejudice. (*Chapman v. California, supra,* 386 U.S. at p. 24.) Defendants' roles in the murders were proven overwhelmingly. They admitted to participating in the murders and to taking Painter's money and his daughter's car. Any error in the wording of the instruction did not affect the verdict beyond a reasonable doubt. (*People v. Aranda* (2012) 55 Cal.4th 342, 367.)

VIII

AFTER-INFORMED INTENT

Holeman asserts that his counsel was ineffective for failing to request a pinpoint instruction on "after-formed intent" following the jury's inquiry during deliberations on whether a robbery or burglary could occur after the victim was deceased. Defense counsel proposed an answer to the jury's question which the court rejected. Counsel's performance was not deficient and no prejudice can be established because other instructions adequately addressed the jury's question.

During deliberations, the jury sent the following note: "If the robbery or burglary takes place after someone is already dead, even if the taking of the property or money is not intended prior to the killing, does this constitute robbery or burglary by the definition as being part of the murder?" The prosecutor indicated that the jury should be directed to the instruction that addressed the question. Counsel suggested that the court should simply answer the question "no" to which the court followed up by stating that "[y]ou

29

can't rob a dead body." The prosecutor stated that the instruction clearly stated that principle but the court disagreed. Counsel then read from part of CALCRIM No. 1600 which stated, "If the defendant did not form this required intent until after using force or fear, then he did not commit robbery." Counsel stated that it went directly to the question being posed. Nevertheless counsel requested again that the court answer the question "no." The court denied that request and instead responded to the jury by stating, "Please refer to the jury instruction number 49 [CALCRIM No. 1600] and jury instruction number 52 [CALCRIM No. 1700]." The prosecutor asked that the court also refer the jury to the special instruction that had been provided regarding the timing of force, but the court declined that request as well.

To prevail on this claim, defendant must establish that counsel's representation fell below an objective standard of reasonableness and there is a reasonable probability that, but for counsel's deficient performance, a more favorable result would have been achieved. (*Strickland v. Washington* (1984) 466 U.S. 668, 686-687; *People v. Williams* (1997) 16 Cal.4th 153, 215.) The reviewing court must indulge in a strong presumption that counsel's conduct fell within the wide range of professional norms. (*People v. Maury* (2003) 30 Cal.4th 342, 389.) To prevail on direct appeal, the record must affirmatively disclose the absence of a rational tactical purpose for the challenged act or omission. (*People v. Ray* (1996) 13 Cal.4th 313, 349.)

Under the circumstances, it cannot be said that counsel's performance fell below professional norms. To begin with, counsel twice suggested an accurate answer to the question, i.e., simply to respond "no" to the jury's question. His performance was not

deficient. [¶] Counsel, having read the instruction, saw that it did indeed answer the jury's question and was under no obligation to seek an additional pinpoint instruction when the jury's question was in essence answered. "[T]rial counsel is not required to make frivolous or futile motions, or indulge in idle acts." (*People v. Reynolds* (2010) 181 Cal.App.4th 1402, 1409.)

The special instruction referenced by the prosecutor stated, "Where a killer wounds the victim, then decides to steal, and thereafter finishes off the victim to accomplish the theft, the perpetrator has committed robbery and robbery murder." In spite of trial counsel's adequate response to the jury's question, Holeman criticizes counsel for not having requested something more elaborate as was used in *People v. Turner, supra*, 50 Cal.3d at page 691.[4] Counsel was not incompetent for requesting such a specific instruction, particularly when his suggestion answered the jury's question and counsel was aware that the standard instructions explained the law. The concept of after-intent was adequately covered by the instructions already given by the court.

It is the defendant's burden on appeal to establish prejudice "as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel." (*People v. Williams* (1988) 44 Cal.3d 883, 937.) Holeman must show that there "is a reasonable probability that, but for counsel's unprofessional errors, the result of the

---

**4** "An act of force *accompanied by a theft* does *not* constitute robbery unless the act of force was *motivated by an intent to steal*. If the intent to steal does not arise until *after* force has been used against the victim, *no robbery has taken place*. [¶] If an individual kills for reasons unrelated to theft, for example, because of anger, fear, or revenge, and then decides to take advantage of the situation by stealing some object from the person of the decedent, *the taking will constitute at most a theft* and not a robbery."

31

proceeding would have been different." (*Strickland v. Washington, supra*, 466 U.S. at p. 694.) It cannot be said that there is a reasonable probability that Holeman would have achieved a better result had counsel asked for a pinpoint instruction. The trial court apparently felt that the instructions answered the jury's question and was unwilling to deviate. Moreover, the instructions did answer the jury's question. As noted before, the instruction for robbery stated that the, "intent to take the property must have been formed before or during the time he or she used force or fear. If the defendant did not form this required intent until after using the force or fear, then he did not commit robbery." (CALCRIM No. 1600.) The instruction on burglary was also clear that the intent to rob must have been formed at the time of entering. Both instructions answered the jury's question and do not meaningfully differ from the instruction that Holeman proposes should have been offered by counsel. He has not met his burden to show that he would have received a more favorable result had counsel requested a pinpoint instruction on after-intent.

IX

TRUE FINDING REGARDING BURGLARY SPECIAL CIRCUMSTANCE

Wright argues that the burglary special circumstance finding regarding Martin should be reversed because the verdict forms inadvertently named Painter and not Martin. We conclude any defect in the verdict form is technical in nature. The form expressed with a reasonable certainty a finding that the special circumstance applied to Martin. The information charged two counts of murder. With respect to Painter (count 1), the information alleges his murder was committed while defendants were committing a

32

burglary and robbery.  In count 2, the victim was Martin and it was alleged her murder was committed while defendants were engaged in the commission of a burglary and robbery.

Before closing arguments, the court indicated to the jury that count 1 pertained to the murder of Painter and count 2 pertained to the murder of Martin.  With respect to the burglary special circumstance allegation, the court read, "The special circumstance allegation as to Count 2 is that the murder of Barbara Martin was committed by the defendant, Samuel Charles Wright Junior, while the said defendant was engaged in the commission of the crime of burglary to the first degree, in violation of Penal Code section 460."  The court also explained the verdict forms to the jury:  "The second special circumstance allegation as to Count 2 may be in one of the following forms:  [¶]  'We, the jury in the above-entitled action, find the murder of Barbara Martin was committed by the defendant, Samuel Charles Wright Junior, while said defendant was engaged in the commission of the crime of burglary of the first degree, in violation of Penal Code Section 460, to be either true or not true.'"

Based on the verdict forms, the jury found Wright guilty of the first degree murders of Painter (count 1) and Martin (count 2); the residential robbery and burglary of Painter (counts 3 and 5); and the residential robbery of Martin (count 4).  The jury found Wright guilty of residential burglary of Painter, as charged in count 5.  The special circumstance findings showed that the jury specifically found that Wright had murdered both Painter and Martin while committing robbery.  In an error in the two verdict forms

33

involving the burglary special circumstance, both name Painter as the victim and omit Martin even though one refers to count 1 and one refers to count 2.

"[T]echnical defects in a verdict may be disregarded if the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice. [Citations.]" (*People v. Webster, supra,* 54 Cal.3d at p. 447; § 1258.) However, if a verdict is ambiguous, it must be considered in light of the issues submitted to the jury and the instructions of the court. (*People v. Radil* (1977) 76 Cal.App.3d 702, 710.) When so construed, if the verdict expresses with reasonable certainty a finding supported by the evidence, it will be upheld. (*Ibid*; *People v. Jones* (1997) 58 Cal.App.4th 693, 710-711.) Verdicts will be liberally construed and their validity sustained if the intention of the jury can be clearly seen. (*People v. Soto* (1985) 166 Cal.App.3d 428, 437.) The verdict should be read in light of the information, the plea entered, and the jury instructions. (*People v. Paul* (1998) 18 Cal.4th 698, 706-707; *Jones,* at p. 710.)

Here, the naming of Painter, instead of Martin, was obviously a technical error. The jury was informed both orally and in writing that count 2 pertained to the murder of Martin and that the burglary special circumstance applied to her in addition to Painter. A technical violation may be found when the verdict form is incorrect but the jury is correctly instructed. (*People v. Escarcega* (1969) 273 Cal.App.2d 853, 857-858.) Moreover, on the verdict form, the special circumstance referenced count 2, the murder of Martin, while mistakenly identifying Painter as the victim, obviously demonstrating a technical violation. (See *People v. Reddick* (1959) 176 Cal.App.2d 806, 819-821.) The

34

error was overlooked but, as in the decision of *People v. Camacho* (2009) 171 Cal.App.4th 1269, 1275, "there is no uncertainty in the record on appeal" that the jury intended to make a true finding on the burglary special circumstance involving Martin, the victim in count 2. We decline to strike the burglary special circumstance as to count 2 as to Wright.

X

JACKET WITH A SWASTIKA

A jacket with a swastika patch was found in Fischer's car when Wright was arrested. Defendants asserted the jacket was owned by Mitchell, the passenger in the stolen car, and not by Holeman. Mitchell had ties with skinhead organizations. Holeman, joined by Wright, contends that the trial court erroneously admitted evidence of the jacket and Mitchell's affiliation with White supremacists, depriving defendants of due process and the right to a fair trial. We disagree.

The evidence was initially proffered as evidence that Holeman had been present in the stolen car, supporting the charge of auto theft (count 6). When Mitchell denied that the jacket belonged to Holeman, the prosecutor sought to establish bias in favor of Holeman. Even assuming the evidence was improperly admitted, any error was plainly harmless because the jacket was shown not to belong to Holeman and the jury was given a limiting instruction. No evidence was presented that showed Mitchell's relationship with defendants was based upon any skinhead ties and, once again, the evidence of defendants' guilt on all counts was overwhelming.

35

Before trial, Holeman sought to exclude evidence about his membership in a White supremacist group, including his statements admitting his membership, a letter written by him using a type of alphabet typically used by such a group, and the jacket with the swastika. The court addressed the admissibility of letters authored by Holeman and found in the car, noting that, "if the evidence shows that they're in a car that he wasn't supposed to have or have any involvement with, that's certainly circumstantial evidence that the jury can consider on the [section] 10851." Additionally, "[t]he same thing would apply with respect to the jacket, if it can be established that it belongs to Mr. Holeman. Certainly, it's prejudicial. But the probative value, in my mind, outweighs the prejudicial effect, especially if there is a limiting instruction given at the time that the evidence is introduced and subsequent[ly] when the jury is instructed."

Defense counsel argued the jacket was unduly inflammatory, akin to calling Holeman a child molester. The prosecutor responded the jacket was circumstantial evidence of Holeman's involvement in the auto theft. Defense counsel protested that the prosecution could use Holeman's admissions that he was in the car and the jacket was irrelevant. The defense asked to remove the swastika in order to lessen the prejudice but still allow the prosecution to prove the nexus between the car and Holeman. The court reserved the issue of the jacket until it made a decision on the admissibility of other evidence.

Before opening statements, the defense sought to exclude any reference to the jacket during the prosecutor's opening statement on the grounds that the prosecution had

36

not laid proper foundation.  The court overruled the objection.  The prosecutor did not refer to the jacket during opening statement.

During trial, defense counsel asserted that the jacket did not belong to Holeman, rather it belonged to Mitchell, the passenger in the stolen car.  The defense requested a 402 hearing to establish ownership of the jacket.  The prosecution challenged Mitchell's credibility.  The defense continued to express concern about the prejudicial impact of the jacket.  The trial court repeated, "We will go ahead.  The Court's ruling remains the same at this point in time without change.  I still think it has some probative value.  The prejudicial effect is not that high in the Court's mind.  And if the testimony comes out as you believe, then it is exculpatory.  And—how should we say—if the witness does not appear to be credible, then it's a question of fact for the jury to determine who is to be believed with respect to that."  Defense counsel then argued that the jacket would be prejudicial, even if it belonged to someone else, because Holeman would be greatly prejudiced to be associated with him.

Officer Denney, who stopped Wright and Mitchell, testified that inside the car trunk he found a leather jacket that bore a swastika.  Mitchell testified he knew Holeman and Wright but he had known Holeman longer.  He testified about partying at the Painter house with Holeman and Wright.  Mitchell had "skinhead" tattoos on his fingers.  Mitchell was a "white power skinhead" when he was 15 years old but had left the group about a year ago.  He acknowledged it was a White supremacist group and used a Nazi swastika as a symbol.  Mitchell identified the jacket with the swastika as his.  Mitchell denied Holeman had a similar jacket.  Mitchell tried the jacket on in court and explained

37

he used to weigh about 30 pounds less. Mitchell stopped being friends with Holeman after the murders had not spoken to him since 2002. The court denied the prosecutor's request for photographs of Mitchell's tattoos because the evidence showed that the jacket did not belong to Holeman.

The defense made a motion for a mistrial based upon the introduction of the jacket. Finding that the probative value outweighed the prejudice, the court denied the motion. The court instructed the jury as follows: "During the trial certain evidence was admitted for a limited purpose. That evidence was a jacket with a swastika. Also, a witness demonstrated certain tattoos on his body. You may consider that evidence only for the purpose of assisting you with whether Jon Holeman was in Janet Fisher's car. You cannot use that jacket or the display of the tattoos for any other purpose, including but not limited to, whether Jon Holeman had been affiliated with White supremacists and whether he had good or bad character." In closing argument, defense counsel admitted that Holeman was in the car on the trip to Victorville with Wright.

Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) A trial court has broad latitude in determining the relevance of evidence. (*People v. Richardson* (2008) 43 Cal.4th 959, 1001.) Such determinations are reviewed for an abuse of discretion. (*Ibid*.) Relevant evidence may be excluded under Evidence Code section 352: "[T]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue

38

prejudice, of confusing the issues, or of misleading the jury." Unless the dangers of undue prejudice, confusion, or time consumption "substantially outweigh" the probative value of relevant evidence, a section 352 objection should fail. (*People v. Cudjo* (1993) 6 Cal.4th 585, 609.) A reviewing court will review for an abuse of discretion and not disturb a trial court's ruling on section 352 absent a showing the court acted in an arbitrary, capricious, or patently absurd manner that resulted in a miscarriage of justice. (*People v. Riggs* (2008) 44 Cal.4th 248, 290; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)

Holeman characterizes the evidence as involving gang membership. But the jacket was not admitted as evidence of any gang membership on his part. The trial court initially made its ruling based on the assertion that the jacket belonged to Holeman. If the jury believed that the jacket belonged to Holeman, it would have tied Holeman to the stolen vehicle and offered proof he was involved in the auto theft as charged in count 6. The trial court did not abuse its discretion in finding that the relevance outweighed any prejudicial impact.

Regarding Mitchell's association with the skinheads, the prosecutor was apparently using it as foundation for Mitchell's knowledge regarding the jacket's ownership and to show Mitchell may have been biased toward Holeman. The evidence showed that only three men—Wright, Holeman, and Mitchell—had been in the car so the jacket probably belonged to one of the three of them. The jury could make its own assessment about who owned the jacket, especially if it appeared too big for Mitchell.

The case of *People v. Perez* (1981) 114 Cal.App.3d 470, 473 is distinguishable. In that case, the trial court permitted the prosecution to present evidence that the defendant was a member of a gang with his codefendant, which tended to corroborate their identification by a witness. The court also admitted evidence that the stolen car was used in a shooting where defendant drove that car against a rival gang. (*Ibid*.) The appellate court found that the admission of the gang membership was in error because the defendant's gang membership did not have any tendency in reason to show identity and could impermissibly lead to unreasonable inferences of guilt by association. (*Id*. at p. 477.) The evidence of the shooting was only slightly probative to show that when the defendant abandoned the car he knew it was stolen. The court concluded that the evidence should have been excluded under section 352 and the error was prejudicial.

Here, the jacket was not evidence of gang membership, as presented in *Perez*, but was admitted to connect Holeman to the stolen car. No evidence was admitted to showed that Holeman was a member of a White supremacist group. Only Mitchell was a participant. Unlike *Perez*, there was no evidence that Holeman or Wright was in a gang or associated with one.

The admission of evidence, even if erroneous, violates due process only if it made the trial fundamentally unfair. (*People v. Partida* (2005) 37 Cal.4th 428, 439; *Estelle v. McGuire, supra,* 502 U.S. at p. 70.) To prove a deprivation of federal due process rights, Holeman must show that the jury could have drawn no permissible inferences from the evidence and the evidence must have been of such a quality to necessarily prevent a fair trial and rendered the trial arbitrary and fundamentally unfair. (*People v. Albarran*

40

(2007) 149 Cal.App.4th 214, 229-230.) The admission of evidence regarding a jacket that did not belong to Holeman and a prosecution witness's affiliation with the skinheads did not render the trial fundamentally unfair. The evidence had little, if any, bearing on Holeman or Wright, and if anything was favorable to the defense. No due process violation occurred and Holeman and Wright were not denied the right to a fair trial.

Defendants assert a due process violation should be analyzed under *Chapman v. California, supra,* 386 U.S. at p. 24, which requires a showing that any error was harmless beyond a reasonable doubt. However, no due process violation has been shown and thus any error should be analyzed under *People v. Watson, supra,* 46 Cal.2d at p. 836, requiring only a showing that it is not reasonably probable that defendants would have received a more favorable outcome had the evidence not been admitted. Under either standard, defendants cannot demonstrate prejudice.

The evidence about the jacket and Mitchell's skinhead affiliation was ultimately insignificant because Mitchell verified that the jacket was his and he had never seen Holeman with such a jacket. Mitchell's association with Wright and Holeman seemed to be based upon drug use and partying. Once the evidence actually came out during trial, it had little bearing on the case and, if anything, reflected poorly on a prosecution witness. Because the evidence had little, if any, impact on the case, there was no prejudice.

Additionally, the court provided the jury with a limiting instruction. The jury was told it could only use the jacket to assist it in determining whether Holeman was in Fisher's car and could not consider whether Holeman had been affiliated with White

41

supremacists or if he had a bad character. It is presumed that the jury understood and followed the court's instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

The strong evidence of Holeman's guilt, particularly his ties to the Painter house, his multiple inculpatory statements, and his attempts to cash Painter's checks render any error in admitting the jacket and Mitchell's skinhead ties harmless beyond a reasonable doubt.

XI

CUMULATIVE ERROR IN WRIGHT'S TRIAL

Wright argues that the cumulative effect of the instructional issues, along with the lack of evidence of intent, compels reversal. The issues with the instructions, alone or in combination, did not deprive Wright of a fair trial. (*People v. Hill* (1998) 17 Cal.4th 800, 844.) A criminal defendant is entitled to a fair trial, not a perfect one. (*People v. Box* (2000) 23 Cal.4th 1153, 1214, *People v.Osband* (1996) 13 Cal.4th 622, 702.) Since "[l]engthy criminal trials are rarely perfect, [we] will not reverse a judgment absent a clear showing of a miscarriage of justice." (*Hill,* at p. 844.) When viewed together, any instructional errors did not amount to a miscarriage of justice. The evidence of Wright's intent to kill and participation in the underlying felonies was overwhelming. Had the jury been instructed as Wright suggested it should have with respect to all the purported errors, the result would have been no different. Different instructions would have had no bearing on Wright's motive, his presence at the scene, the manner of the killings, his post-crime behavior, and his admissions of participation. Wright was not denied his right

to a fair trial or his right to a reliable verdict.  (*People v. Earp* (1999) 20 Cal.4th 826, 904.)

XII

SECTION 654 AND DOUBLE JEOPARDY

Defendants contend that the concurrent terms imposed for the robbery and burglary convictions should have been stayed pursuant to section 654 and the failure to stay the terms of those offenses contravened state and federal law, violating principles of double jeopardy violation.  We hold there is no double jeopardy violation because state law permits punishment based on the same acts when there is a different intent and objective.  Here, substantial evidence supports an implicit finding that defendants harbored both the intent to kill and the intent to rob, thus permitting punishment on the robbery and burglary.

A finding under section 654 is factual in nature and will not be reversed on appeal unless unsupported by the evidence.  (*People v. Wynn* (2010) 184 Cal.App.4th 1210, 1215.)  If, as here, the court makes no express section 654 finding, a finding that the crimes were divisible and thus subject to multiple punishments is implicit in the judgment and must be upheld if supported by substantial evidence.  (*People v. Lopez* (2011) 198 Cal.App.4th 698, 717.)

The decision in *People v. Osband, supra*, 13 Ca1.4th 622, supports the trial court's decision.  In that case, like here, the defendant asserted that because he was found guilty of felony murder on the basis of the underlying crimes of rape or robbery, or both, the court violated the Fifth Amendment's double jeopardy clause and section 654 when he

43

was sentenced on the crimes of rape and robbery. (*Id.* at p. 730.) Citing to *People v. Saffle* (1992) 4 Cal.App.4th 434, 438, the court rejected the defendant's argument reasoning that, because it is unknown whether the defendant was found guilty of first degree murder on a theory of felony murder or premeditation and deliberation, there was a section 654 problem. Also, like here, substantial evidence supported the trial court's implicit determination that the crimes involved more than one objective. (*Osband,* at pp. 730-731.)

In light of the decision in *Osband* and the manner of the killings—multiple blows to the head and strangulation/suffocation—the evidence was sufficient to support the trial court's implicit decision that defendants harbored different criminal objectives and intents in murdering Painter and Martin while also committing burglary and robbery. In other words, defendants can be sentenced on both the special circumstances and the underlying offenses because they harbored both the intent to kill and the intent to rob, two different objectives.

Defendants' double jeopardy argument also is without merit. The double jeopardy clause of the Fifth Amendment protects against multiple punishments for the same offense. (*North Carolina v. Pearce* (1969) 395 U.S. 711, 717.) A criminal defendant's sentence will violate double jeopardy if he is punished for felony murder and the underlying felony but only when the state's Legislature did not intend to allow conviction and punishment for both. (*Jones v. Thomas* (1989) 491 U.S. 376, 381; *People v. Wader, supra*, 5 Cal.4th at p. 670, fn. 14.) However, as discussed above, section 654 was not violated here, and moreover, there can be no double jeopardy violation here because the

44

life sentence may be based upon the multiple murder special circumstance, not the robbery and burglary special circumstances. Thus, no double punishment has occurred here and the sentence should be undisturbed.

## XIII

## DISPOSITION

We reject defendants' respective claims of insufficiency of evidence, instructional error, error in the verdict form, evidentiary error, double jeopardy, and cumulative error.

We affirm the judgments.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

HOLLENHORST
J.

45